## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Jason E. Wolf, | ) | |
| | ) | **ORDER GRANTING DEFENDANT'S** |
| Plaintiff, | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | **AND DENYING PLAINTIFF'S MOTION** |
| vs. | ) | **FOR SUMMARY JUDGMENT** |
| | ) | |
| Carolyn W. Colvin, Acting Social Security | ) | |
| Administration Commissioner, | ) | Case No. 1:14-cv-058 |
| | ) | |
| Defendant. | ) | |

The plaintiff, Jason E. Wolf ("Wolf"), seeks judicial review of the Social Security Commissioner's denial of his application for Social Security Disability Insurance Benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-434. This court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## I.    BACKGROUND

### A.    Procedural history

Wolf filed an application for Social Security Disability Insurance Benefits ("DIB") on March 12, 2012, alleging an onset date of September 9, 2011. (Tr. 170-176). His application was denied initially and upon reconsideration. (Tr. 110-116).

An Administrative Law Judge ("ALJ") convened an administrative review hearing on May 16, 2013. (Tr. 32-84, 133-45). He issued a written decision denying Wolf's application on May 29, 2013. (Tr. 12-26). The Appeals Council denied Wolf's subsequent request for review and on March 31, 2014, adopted the ALJ's decision as the Commissioner's final decision. (Tr. 1-3).

Wolf initiated the above-entitled action on May 29, 2014, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). The parties have since filed

summary judgment motions that are now ripe for review. They have also filed notice of their consent to the undersigned's exercise of jurisdiction over this matter.

**B.**     **Factual background**

**1.**     **Wolf's personal data and work history**

Wolf stands five feet, nine inches tall. (Tr. 40). At the time of his administrative hearing he was 34 years old and weighed 300 pounds. (Tr. 39-40). (Tr. 31). He lives with Ray Ann Christmann. (Tr. 39). He has three minor children who live with their mother. (Tr. 40). He has graduated from high school. He has twice attended college but does not have a degree. (Tr. 481).

Wolf has worked as construction laborer, locator of underground utility lines, mechanic, and heavy equipment operator. (Tr. 274-79, 308-13). He was most recently employed as a bore machine operator by Dakota Line Contractor's Inc. (Id.). He has not engaged in any substantial gainful activity since September 2011. (Tr. 17, 44). He subsists on monthly workers compensation payments and his wife's earned income. (Tr. 45, 61, 257-264).

Wolf suffers from a torn rotator cuff, obesity, a degenerative disc disease of the cervical spine, depression, anxiety, a learning disability that affects his reading comprehension, and sleep apnea. (Tr. 17-20). He also reported that he has a cataract in one of his eyes, that his eyes are very light sensitive, that he cannot drive at night without his glasses, that he has limited use of his left arm, and that he experiences chronic pain in his lower back and between his shoulder blades. (Tr. 43, 50, 61, 79). For pain relief, he has in the past taken a combination of prescription painkillers and muscle relaxers. (Tr. 62-63, 264, 272). However, he now relies primarily upon over-the-counter pain relievers such as ibuprofen and naproxen. (Tr. 63). For his depression, he has been prescribed Paxil. (Tr. 272).

## 2.    Summary of Wolf's relevant medical history

Wolf presented to the emergency room on September 18, 2011, with complaints of severe shoulder and neck pain dating back one week. (Tr. 367). X-rays of his chest and left shoulder were negative. (Tr. 370, 373-74). He was prescribed painkillers and muscle relaxers and discharged in stable condition. (Tr. 371-72).

On September 20, 2011, Wolf was examined by Dr. Laura Archuleta, who recommended that he participate in physical therapy and return in two weeks for further evaluation. (Tr. 399-400). Records reflect that Wolf reported to the Human Performance Center for physical therapy the following day and returned a handful of times thereafter. (Tr. 353, 456-58).

MRIs of Wolf's left shoulder and cervical spine were taken on September 29, 2011. (Tr. 365-66). The MRI of his shoulder revealed that he had a small intrasubstance tear of the supraspinatus tendon, mild to moderate tendinopathy of the supraspinatus tendon, and moderate AC joint degenerative change. (Tr. 365). The MRI of his cervical spine revealed that he had disc protrusions at C5-C6 and C6-C7, moderate central canal stenosis at C5-C6, severe central canal stenosis at C6-C7, and severe left-sided neural foraminal stenosis at C6-C7. (Tr. 365-66).

Wolf was referred to Dr. Timothy Juelson, who, on October 3, 2011, gave him a corticosteroid injection in his shoulder. (Tr. 393-94).

On October 24, 2011, Wolf returned to Dr. Archuleta for a followup examination. (Tr. 402). In her notes, Dr. Archuleta opined that, absent surgical intervention, it was unlikely that Wolf would have any significant long-term recovery. (Id.). She issued Wolf a prescription for gabapentin and recommended that he follow up in one month's time. (Id.).

On November 22, 2011, Wolf underwent a psychological evaluation with Dr. Thomas Eick

at the West Center Human Service Center in Bismarck, North Dakota. (Tr. 418). During the evaluation, Wolf described symptoms of insomnia, depression, and anxiety brought on by his chronic pain, his inability to work, and attendant financial concerns. (Id.). Dr. Eick recommended that Wolf continue with individual therapy, started him on Lunesta and Paxil, and instructed him to return the following month. (Tr. 419).

On January 24, 2012, Wolf presented to Steve Churchill, a therapist with AIM Physical Therapy ("AIM"), for a standardized IWS Functional Capacity Evaluation. (Tr. 404-408). After two days of testing, Mr. Churchill concluded that Wolf was capable of performing "light to medium" work as those terms are defined on the Dictionary of Occupational Titles. (Tr. 406). Specifically, he opined that Wolf was "best suited for aspects of the upper range in the LIGHT work category and lower aspects of the MEDIUM work." (Id.)

On January 30, 2012, Wolf presented to Dakota Pain Management Center for a physiatry initial assessment with Dr. Carol Krause. (Tr. 437-440). On April 14, 2012, he followed up with Dr. Krause. (Tr. 435-36). In her notes of this latter visit, Dr. Krause made the following observations about the Functional Capacity Evaluation performed at AIM:

> They put him in the light to medium category of work. I would modify this to light category of work. They do note difficulty with him with use of the left arm especially overhead and recommend lifting this. However, under elevated work, they say occasional to frequent due to difficulty with left arm. I would limit this to occasional. They note sitting tolerance as frequent but he does need to get up and move every hour. They rate standing tolerance and walking tolerance as frequent. However, the patient states he can go 15 to 20 minutes at a time and needs to rest. They also talk about deconditioning, so I think a frequent standing and walking tolerance would be a little much. I'd limit this more to occasional. Other than that, his functional capacity assessment is a good starting point for his work restrictions.

(Tr. 435)

On April 28, 2012, Wolf returned to Dr. Krause, who encouraged him to continue taking his

4

pain medication and further counseled him on techniques to manage his pain. (Tr. 433-34).

On March 13, 2012, Wolf returned to Dr. Krause, reporting that his neck pain had recently flared up and that he was experiencing numbness down his left arm into his fingers. (Tr. 431-42). Dr. Krause refilled his prescription for hydrocodone, increased his daily dosage of gabapentin, and again counseled him on techniques to help with pain management. (Id.).

On March 2, 2012, Wolf presented to Dr. Craig DeGree for a psychological evaluation. (Tr. 481-483). In his report, Dr. DeGree noted that Wolf had expressed a desire to obtain a commercial drivers' license ("CDL") or, in the alternative, find work with a local cable company in a position compatible with his physical limitations. (Tr. 481). He further noted that Wolf had taken the CDL test with accommodations but had failed. (Tr. 482). With respect to Wolf's educational history, he highlighted the fact that Wolf had twice attended college, first in Wahpeton for a year and later at Bismarck State College for nine months, but had struggled with the content material and had not obtained a degree. (Id.). Reviewing Wolf's test results, he diagnosed Wolf with the following: (1) a mixed receptive-expressive language disorder; (2) a reading disorder; (3) a disorder of written expression; and (4) an adjustment disorder with mixed emotional features. (Tr. 483).

On March 27, 2012, Wolf followed up with Dr. Krause. (Tr. 484). According to Dr. Krause's notes, Wolf had pushed himself too hard when doing chores around the house and had exacerbated his shoulder and neck pain. (Id.). Dr. Krause counseled him, gave him samples of Celebrex, and encouraged him to return as needed. (Id.).

An MRI of Wolf's neck taken in January 2013 showed "severe narrowing of the central spinal cord at C6-7 and at the neural foramen which is were the nerves exit the spine also at the C6-7 level." (Tr. 486).

On February 13, 2013, Wolf presented to surgeon Steve Kraljic for a discectomy and fusion at C5-6 and 6-7. (Tr. 514-15).

In April 2013, Wolf presented to Dr. Chatree Wongjirad for a sleep study. (Tr. 525). He was diagnosed with severe obstructive sleep apnea, for which he was prescribed a CPAP machine. (Id.).

### 3. "Function Reports"

#### a. Ray Ann Christman's report

Ray Ann Christman, Wolf's wife, submitted a third-party "function report" dated March 2, 2012, in support of Wolf's application for disability insurance benefits. (Tr. 257-264). Therein she reported that Wolf could not carry as much as a jug of milk without discomfort, could no longer play with his children, and needed assistance when shaving his head as he could not raise his arms overhead. (Id.). She further reported that although Wolf remained capable of driving and assisting with some very basic household tasks, such as grocery shopping, laundry or basic food preparation, he did so with observable discomfort. (Tr. 260-261). With respect to Wolf's ability to focus, she indicated that it fluctuated depending on his pain level or mood. (Tr. 262). With respect to Wolf's comprehension, she reported that he indeed had some issues but added that "if he understands he can do well." (Id.).

#### b. Wolf's report

Wolf also submitted a "function report" in March 2012. (Tr. 265-272). Therein he reported that his ability to engage in simple activities, i.e., cooking, cleaning, and washing clothes, had been hampered on account of his condition, that he experienced substantial discomfort in his neck and shoulder when trying to exercise, and that his pain typically hovered between a 7 and 10 most nights. (Tr. 265-268). By his estimation, he could walk 10 minutes before needing to stop and, depending

on his pain level, would need to rest any where between 5 and 30 minutes before resuming.  (Tr. 270).

### 4.    "Paper Reviews" Performed by Consulting Physicians

#### a.    Dr. Godfried's Consultive Examination Report submitted in April 2012

Dr. Ernest Godfried, a consulting physician, submitted a report of his findings and conclusion–that Wolf was not disabled–to the Social Security Administration in April 2012 following a "paper review."  (Tr. 89-96).  Based upon his review of the documentation provided to him, Dr. Godfried was of the opinion that Wolf's soft tissue injuries and spinal disorders were severe, that Wolf's affective and anxiety disorders were "non severe," that Wolf's restrictions on daily living activities, difficulties in maintaining social functioning, and difficulties were in maintaining concentration/persistence/ pace were mild, and that Wolf had at least partially compromised his credibility by overstating his symptoms.  (Tr. 91-92).  He calculated that Wolf had the residual function capacity to:  lift 20 pound on occasions, lift 10 pounds with some frequency; stand and/or walk  for about 6 hours in an 8-hour day, sit  (with normal breaks) for 6 hours in an 8-hour day; occasionally climb stairs, ladders, and ropes; and occasionally balance, stoop, kneel, crouch and crawl.  With respect to manipulative limitations, Dr. Godfried noted that Wolf's ability to reach in any direction (including overhead) was limited as was his "Handling (gross manipulation)" on his left.  (Tr. 93) (explaining: "[Wolf] [h]as a left rotator cuff tear which needs surgery; function at the present time is very limited with any lifting and or reaching.  Still has grip strength and feeling and can use fingers.").

### b. Dr. Johnson's Consultive Examination Report submitted in July 2012

A second "paper review" of Wolf's file was conducted by Dr. Marlin Johnson, a consulting physician in July 2012. (Tr. 99-109). Like Dr. Godfried before him, Dr. Johnson concluded that Wolf was not disabled. And his reported findings mirrored those of Dr. Godfried's. (Id.).

### 5. Administrative hearing

#### a. Wolf's testimony

Wolf testified that he received special education services while in high school to address his learning disability. (Tr. 42). He further testified that some time after graduating from high school he enrolled in Bismarck State College's on-the-job plumbing school but was unable to finish the program. (Id.). When asked about his learning disability, he testified that he has difficulty with reading comprehension and with "writ[ing] it out in full sentences." (Tr. 44). When asked whether he could perform simple arithmetic, he responded in the affirmative. (Id.). However, he added that his wife manages their finances and, when making purchases, he oftentimes has difficulty figuring out how much change he should get back. (Id.).

Wolf went on to testify that he was injured while at work on September 9, 2011, and has since been unable to return to any of his past jobs. (Tr. 44-45). However, when pressed, he did acknowledge that he had not applied for any other work. (Tr. 46).

When queried further about his injury and how it impacted his physical health, Wolf responded that he has ongoing back, shoulder, and neck discomfort, can only walk short distances before he needs to sit, and that the pain in his lower back and between his shoulder blades is exacerbated by walking or sitting for extended periods of time. (Tr. 47, 50). Additionally, he testified that he cannot tolerate lifting more than ten pounds at any given time, cannot walk more

than 10 to 15 minutes before he needs to take a break, cannot sit more than twenty to thirty minutes before he needs to get up and move around, cannot stand for more than forty-five minutes in an eight-hour day, cannot crawl, kneel or squat, and is limited in the number of stairs that he can traverse on any given day. (Tr. 55-59, 67-68). He also testified that he experiences sleep disturbances that doctors have attributed to his sleep apnea and that he had been prescribed a CPAP machine. (Tr. 61-62). When asked to elaborate on his shoulder issue, he responded that he has full range of motion but continues to experience ongoing discomfort and anticipates that at some point he may require surgery. (Tr. 67).

When asked to rate the pain he experiences on a typical day on a scale of one to ten, with ten being the most severe, Wolf responded that it can reach as high as an eight when he is active but, "if [he] can get into that comfort zone level, [he] can get it down to a one or a two and try keep it in there." (Tr. 50). He further testified that, while his counseling sessions with his physiatrist, Dr. Krause, have helped him to manage his pain to the point that he now relies primarily upon over-the-counter pain relievers as opposed to prescription medication for pain relief, he does experience "flare ups" when engaging in physical activity. (Tr. 49-52,63-64).

Segueing to the issue of his mental health, Wolf testified that he had sought out counseling for depression and anxiety in the year following his injury but that things had improved and that he was no longer seeing anyone. (Tr. 52).

When asked to describe his daily routine, Wolf testified that he remains capable of tending to his personal needs, drives up to 20 miles per day, and tries to contribute around the house by taking out the garbage, doing a little bit of simple cooking, and running small errands. (Tr. 46-47). In regards to his social life, he testified that he remains in contact with his friends by telephone, has

a Facebook account, attends church weekly, and tries to attend his children's school activities as his health permits. (Tr. 47, 52-55).

In response to inquiries regarding his strength, stamina, and dexterity, Wolf testified that he could carry no more than 10 pounds at any given time, could walk no longer than 10-15 minutes before needing to sit down, could stand no more than 5 minutes at a time and no more than 30 minutes total in an 8-hour day, could sit no more than 45 minutes at a time, and could only climb a modest number of stairs. (Tr. 55-59). Additionally, he testified that, although capable of bending over and touching his toes, he could not squat, crawl, or kneel. (Tr. 58-59). Finally, he testified that he could extend his arms both in over his head and directly in front of himself, could manipulate small things like buttons and zippers, and could grasp and hold larger objects the size of oranges or grapefruits. (Tr. 59).

At the close of the hearing, following testimony from the vocation expert, Wolf advised the ALJ that he could neither tolerate vibrations in his left arm or lift anything with his left arm. (Tr. 79).

### b.    Vocational expert's testimony

When examining the vocational expert, the ALJ first inquired whether a hypothetical individual of Wolf's age, education, and vocational background could perform Wolf's past relevant work if he: (a) could sit for 45-60 minutes, alternative to a standing position for 5 minutes, and then resume sitting; (b) could not kneel, crawl, or climb ladders, ropes, and scaffolds; (c) could occasionally crouch or climb stairs and ramps; (d) could not engage in any overhead reaching; (e) could not work when exposed to cold or bright lights; (f) had to receive instructions orally and not in written form; and had to avoid left hand carrying. (Tr. 71-73). Second, he asked the ALJ to

consider how the following would impact this hypothetical person's ability to work: (a) a limitation of standing and walking for 2 hours and sitting for 6 hours; and (b) ability to crouch only rarely. (Tr. 73-74). Third, he inquired whether this hypothetical individual could work if he could: (a) sit up to 45-50 minutes at a time; (b) stand/walk for less than 2 hours total and sit less than 6 hours total in an 8-hour day; (c) never climb ladders, ropes, or scaffolds; (d) occasionally climb stairs and ramps; (d) neither crawl nor reach overhead; (f) not tolerate exposure to cold or bright lights; and (g) perform simple, routine tasks and maintain concentration, pace, and persistence for two-hour segments. (Tr. 74-75).

The vocational expert testified that the individual described in the ALJ's first hypothetical would be unable to perform Wolf's past relevant work but nevertheless could perform light, unskilled work. (Tr. 77-3). With respect to the second hypothetical, the vocational expert testified that the individual described would be able to perform routine, sedentary jobs. (Tr. 73-74). As examples, he cited the occupations of addresser, sorter, and final assembler. (Tr. 73-74). Finally, with respect to the third hypothetical, he testified that the parameters as outlined by the ALJ would exclude the individual from essentially all jobs. (Tr.74-75).

After the vocational expert had responded to the ALJ's hypotheticals, counsel for Wolf was afforded an opportunity for examination. First, counsel inquired about the specific vocational training that would be required in order to perform the occupations cited by the vocational expert. (Tr. 76). Second, counsel inquired how a communicative or cognitive deficit would impact on one's ability to work. (Tr. 76). Third, counsel inquired whether an individual whose pain level severely compromised his ability to concentrate could perform any meaningful work. (Tr. 77).

The vocational responded that a maximum of thirty days training would be required to

perform the cited occupations and that the inability to comprehend simple instruction "would be a very negative factor in terms of work in general." (Tr. 76-77). As for counsel's third inquiry regarding pain and its limiting effects, he testified that an individual would likely be unable to perform any of the cited occupations if his ability to concentrate was so compromised. (Tr. 78).

Before adjourning, the ALJ revisited his hypotheticals to address Wolf's testimony that he could neither lift with his left arm or tolerate vibrations in his left arm. (Tr. 79-80). Specifically, the ALJ inquired how the person described in his hypotheticals would be impacted if he had to avoid hazards such as vibrations, could only with lift with right hand, or had no useful ability in his left arm or hand. (Tr. 81).

The vocational expert responded that vibrations would have little to no effect on one's ability to perform the cited occupations. (Tr. 81-82). As for left arm or hand issues, the vocational expert testified that it would be possible to perform the cited occupations so long as one could use the left hand in a "bracing fashion." (Id.). The vocational expert then added that the performance of such occupations would not be possible if one could not use his left hand at all. (Id.).

### C.   ALJ's decision

The ALJ employed the five-step sequential analysis when evaluating Wolf's application. At step one, he concluded that Wolf had not engaged in any substantial gainful activities since September 9, 2011, the alleged onset date. (Tr. 17). At step two, he concluded that Wolf suffered from the following severe impairments: status post discectomy and fusion CS-6 and C6-7; left rotator cuff tendinitis; obesity; and a learning impairment (reading disorder). (Tr. 17-19). He did not consider Wolf's sleep apnea to be a severe impairment, however, stressing (1) the dearth of evidence of any work-related limitations secondary to the apnea, and (2) the fact that the apnea had

appeared amenable to medical treatment. (Tr. 18). He likewise refused to consider Wolf's light sensitivity as a severe impairment as, in his opinion, there was no evidence in the record to reflect any disabling visual impairment. (Id.).

Moving on to step three, the ALJ concluded that none of Wolf's aforementioned impairments, either singly or in combination, were presumptively disabling. (Tr. 14-15).

At step four, the ALJ made the following determination with respect to Wagner's residual function capacity:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined by 20 CFR 404.1457(a) except carrying should be performed with the dominant (right) arm with use of the non-dominant (left) arm for bracing/assisting. The claimant is able to stand/walk for 2 hours and sit for 6 hours. The claimant would require a sit/stand option wherein he would sit for 45-60 minutes, alternate to standing position for 5 minutes, then resume sitting. The claimant should never climb ladders/ropes/scaffolds. The claimant can occasionally climb stairs/ramps and balance. The claimant can rarely stoop and crouch. The claimant should never kneel or crawl. The claimant should do no overhead reaching. The claimant should do no work in exposure to cold or bright lights. The claimant should do no work in exposure to hazards. The claimant can perform simple, routine, repetitive tasks. The claimant can maintain concentration, pace, and persistence for 2-hour segments. The claimant has no problems interacting with others. The claimant would have to get instructions in oral, not written form.

(Tr. 20).

In making this determination, the ALJ acknowledged that, while there was some dispute over the etiology of Wolf's neck and back issues, his medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 20-21). The ALJ also acknowledged that the objective evidence supported the conclusion that Wolf's ability to function had declined both physically and mentally. (Tr. 21-22). The ALJ nevertheless remained unconvinced that this decline was so precipitous that it precluded him from performing any type of work on a regular and sustained basis. (Id.).

The ALJ did not fully credit Wolf's testimony regarding the intensity, persistence, and limiting effects of his symptoms, citing: (1) Wolf's history of work at the semi-skilled to skilled level; (2) the care taken by Wolf not to engage in certain activities for fear of jeopardizing his worker's compensation case; (3) Wolf's expressed interest in a plumbing apprenticeship, which the ALJ viewed as good evidence of Wolf's capability of engaging in activities at least to the level of his residual functional capacity; (4) the lack of any documented impairments in his lower extremities or other objective medical evidence demonstrative of any standing/walking limitations; (5) the dearth of evidence demonstrative of significant deficits in concentration, persistence, and pace; (6) Wolf's stated ability to maintain his focus on the task at hand; and (7) the report of some improvement in Wolf's symptoms following surgery. (Tr. 21-23).

The ALJ likewise afforded reduced weight to the "capacity assessments and correspondence," the Functional Capacity Evaluation performed at AIM, and the DDS determinations. (Tr. 24). Specifically, with respect to the capacity assessments and correspondence, he opined that they did not reflect the full course of the medical record as they were provided before Wolf had undergone physical therapy or surgery. (Id.). With respect to the DDS determinations, he noted: (1) "the finding for light work [did] not consider the limitation concerning the use of his left arm; and (2) "the finding of an ability to stand/walk for 6 hours [was] not consistent with results of the function capacity evaluation." (Id.). He did, however, afford great weight to Dr. Carol Krause and her statement that Wolf would be limited to work lighter than that referenced in the functional capacity evaluation. (Id.).

Moving on to step five, the ALJ opined that while Wolf was unable to perform any of his past relevant work, he remained capable of performing light and unskilled sedentary work given his

age, education, work experience, and residual functional capacity. (Tr. 24-25). Consequently, ALJ concluded that Wolf was not disabled as defined by the Act from September 9, 2011, through the date of the ALJ's decision. (Tr. 25-26).

## II.    GOVERNING LAW

### A.    Law governing eligibility for adult benefits

An individual shall be considered to be disabled for purposes of DIB if the person is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. E.g., Hilkenmeyer v. Barnhart, 380 F.3d 441, 443 (8th Cir. 2004); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)[1] and determine:

(1)    whether the claimant is presently engaged in a substantial gainful activity,

(2)    whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3)    whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)    whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)    if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

[1] The provisions in 20 CFR Part 404 apply to DIB and the provisions in Part 416 apply to SSI benefits.

If the ALJ reaches the fourth or fifth steps, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945. The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id. In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[2] E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005) ("Ellis"). A claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. Pearsall v. Massanari, 274 F.3d at 1218.

## B.    Standard of review

The scope of this court's review is limited. The court it is not permitted to conduct a *de novo* review. Rather, it must look at the record as a whole to determine whether there is substantial evidence to support the Commissioner's decision. Ellis, 392 F.3d at 993.

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. E.g., Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) ("Buckner"). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nelson v. Sullivan, 966

_____

[2] The Polaski factors are now embodied in 20 C.F.R. §§ 404.1529, 416.929.

F.2d 363, 366 n.6 (8th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results. <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." <u>Id.</u> Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion. <u>Id.</u>; <u>Buckner</u>, 646 F.3d at 556 ("Rather, if, after reviewing the record, we find that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the decision of the Commissioner.") (internal quotations and citations omitted).

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole. <u>See</u> <u>Haggard v. Apfel</u>, 175 F.3d 591, 594 (8th Cir. 1999) ("<u>Haggard</u>"); <u>Brockman v. Sullivan</u>, 987 F.2d 1344, 1346 (8th Cir. 1993) ("<u>Brockman</u>"). The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." <u>Anderson v. Barnhart</u>, 344 F.3d 809, 814 (8th Cir. 2003) ("<u>Anderson</u>").

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. <u>Ellis</u>, 392 F.3d at 993.

III.  **DISCUSSION**

   A.      **Consideration Given to Wolf's Impairments in Combination**

   Wolf first asserts that the ALJ failed to adequately consider the combined impact of all his impairments, particularly those the ALJ did not consider severe (sleep apnea, light sensitivity, etc.), when assessing his ability to participate in substantial gainful activity.   In an effort to illustrate this point, he states, although the ALJ acknowledged that his obesity was a severe impairment that more than minimally interfered with his ability to work, the ALJ did not engage in any extended and explicit discussion about how his obesity sapped his energy, exacerbated his sleep apnea, and made it difficult to ambulate.

   In response, the Commissioner maintains that the ALJ's language throughout the decision reflects that he indeed considered the combined effects of Wolf's impairments. The Commissioner further asserts that ALJ's explicit statement at the outset of his decision–that he reached his decision after carefully considering of all of the evidence–should be sufficient to assuage any concerns regarding the consideration given to the combined effects of Wolf's impairments.

   In determining a claimant's residual function capacity, "the ALJ must consider the effects of the combination of both physical and mental impairments," Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004), to "determine whether the combination of . . . impairments is medically equal to any listed impairment," Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003) (quoting 20 C.F.R. § 404.1526(a)).

   A close reading of the ALJ's decision confirms that the ALJ did just that; the ALJ summarized Wolf's medical records and discussed each of Wolf's impairments, including Wolf's physical and mental health, obesity, pain complaints, light sensitivity, sleep apnea, cognition,

attention deficits, and learning disability/mixed receptive-expressive language disorder along with representations made by Wolf regarding his stamina, persistence, and pace. (Tr. 18-22). In so doing, he acknowledged that a number of Wolf's impairments could fairly be characterized as severe. Nevertheless, he was of the opinion that these impairments "were not attended, singly or in combination with any other impairment, with the specific clinical signs and diagnostic findings required to meet any listed impairment." (T. 19).

It is well accepted in the Eighth Circuit that such a summary and pronouncement is enough to establish that the ALJ has properly considered the combined effects of a claimant's impairments. See Martise v. Astrue, 641 F.3d 909, 924 (8th Cir. 2011) ("The ALJ expressly found that Martise does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments . . . . Based on the ALJ's synopsis of Martise's medical records and discussion of each of Martise's alleged impairments, we conclude that the ALJ properly considered the combined effects of Martise's impairments." (internal quotation marks omitted)); Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994) (finding no basis for claimant's assertion that the ALJ failed to consider the combined effects of the claimant's impairments in light of the ALJ's recitation of a claimant's impairments followed the statement that no impairment or combination thereof was of listing level severity); Browning v. Sullivan, 958 2d 817, 822 (8th Cir. 1992) ("After separately discussing Browning's physical impairments, affective disorder, and complaints of pain, as well as her daily level of activities, the ALJ found that her impairments do not prevent [her] from performing her past relevant work. To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." (internal quotation marks omitted)); see also Raney v. Barnhardt, 396 F.3d 1007, 1011 (8th Cir. 2005) ("After the ALJ listed all of Raney's physical and

mental impairments, he expressly stated he considered Raney's impairments individually and in combination," and based his RFC assessment on "the combination of [Raney's] impairments. The ALJ found no evidence that the combined clinical findings from these impairments reached listing-level severity. The record persuades us the ALJ properly considered the effect of Raney's combined physical and mental impairments." (internal quotation marks omitted)). Consequently, the undersigned concludes that the ALJ properly considered Wolf's combined impairments when assessing Wolf's residual functional capacity.

**B.      Credibility Determination**

Wolf next asserts that his subjective complaints were supported by the record as a whole and that the ALJ erred to the extent that he discounted them. Specifically, he takes exception to the ALJ's suggestion that he was reluctant to engage in work activities for fear that it would jeopardize his WSI benefits. He also asserts that the ALJ flouted both the facts and the law when pronouncing him capable of performing simple, routine, and repetitive tasks, able to complete an 8-hour work day, and able to maintain concentration, pace and persistence for 2-hour segments despite overwhelming evidence to the contrary. Finally, he asserts in a rather shotgun fashion that the ALJ purposefully overstated his intellectual abilities and improperly ignored his Global Assessment of Functioning ("GAF") score, erred when analyzing his pain complaints, misstated that he had a high school education and could communicate in English, substituted his own medical judgment in place of those from acceptable medical sources, cherry picked evidence, and otherwise attached an inordinate amount of significance to his expressed desire to pursue a plumbing career.

Not surprisingly, the Commissioner disputes Wolf's characterization of the record and maintains there was substantial evidence in the record to support the ALJ's credibility determination.

In so doing, she highlights inconsistencies in the record. For example, she juxtaposes Wolf's testimony at the administrative hearing that he had not been looking for work since his employment ended in 2011 with a statement made by Wolf to Dr. Eick in April 2012 that he had been looking for work. (Tr. 46 and 441). Additionally, she notes that no medical or vocational professional considered Wolf unable to work, that Drs. Churchill, Krause, and DeGree at one time or another expressed their belief that Wolf could perform at least light work activities, that Dr. Krause also encouraged Wolfe to pursue vocational training, and that Dr. DeGree was of the opinion that Wolf could benefit from job counseling. (Tr. 431-33, 482-83).

Having reviewed the record in its entirety, the court would not necessarily draw the same conclusions as those of the ALJ. For example, the court would not necessarily extrapolate from statements made by Wolf regarding WSI that he was "sandbagging" in an effort to preserve his benefit or that his stated desire to pursue a plumbing career somehow reflected of his residual functional capacity. That being said, not all of Wolf's assertions are borne out by the record. With respect to Wolf's intellectual abilities, the ALJ's statement that he has a high school education is not the abject distortion that Wolf maintains, particularly when viewed in conjunction with the ALJ's recognition that Wolf received special education while in school and that his learning disability constituted a moderate impairment when it came to concentration, persistence, and pace and a severe impairment in terms of reading and writing. (Tr. 18-19). With respect to Wolf's GAF scores, it is clear from the record that they factored into the ALJ's analysis; in his decision the ALJ noted that Wolf "appear[ed] to have done reasonably well from a mental health standpoint including good global assessment of functioning scores typically ranging from 60-66, with a singular reference to a score of 55." (Docket No. 18).

In the final analysis, the ALJ's interpretation of the statements made by Wolf are not beyond the pale and the court is mindful that it is prohibited from substituting its own judgment in place of the ALJ's interpretation or weigh the evidence de novo. See Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997). As noted above, the ALJ's credibility assessments are entitled to great deference when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole. See Haggard v. Apfel, supra.

In sum, the ALJ gave clear reasons for his credibility determination and there appears to be sufficient evidence in the record to support them.

## C. Hypotheticals

Finally, Wolf takes issue with the hypotheticals that the ALJ posed to the vocational expert. Specifically, he asserts that the ALJ failed to incorporate his pain, fatigue, attention deficits, and stated inability to stand longer than 20-30 minutes. He also asserts that failed to consider his inability to work with vibrations and or use his left hand.

The Commissioner is dismissive of Wolf's assertions, asserting that they are conclusory. The Commissioner further asserts that, when framing the hypotheticals, the ALJ needed only to incorporate those limitations he deemed credible and in so doing again highlights inconsistencies in the record that in her mind justifiably diminished Wolf's credibility in the ALJ's eyes. See Vanderboom v. Barnhard, 421 F.3d 745, 750 (8th Cir. 2005).

The real dispute here is not with the hypotheticals *per se* but rather with the ALJ's determination of Wolf' RFC. Having reviewed the record, it is apparent to the undersigned that the hypotheticals posed by the ALJ were consistent with the determinations he made concerning Wolf's

physical and mental capabilities. It is also worth noting that counsel was afforded the opportunity to examine the vocational expert and, at the close of the hearing, when Wolf expressed concern regarding his intolerance to vibration and left arm/hand limitations, the ALJ himself revisited his hypotheticals with the vocational expert to discuss these concerns.

IV.    **CONCLUSION**

In this case, there is enough evidence supporting the Commissioner's decision to meet the "substantial evidence" threshold and the decision to deny benefits falls within the zone of choice that prohibits this court from reversing the decision even though there is substantial evidence supporting a contrary outcome. Accordingly, Wolf's Motion for Summary Judgment (Docket No. 10) is **DENIED**, the Commissioner's Motion for Summary Judgment (Docket No. 12) is **GRANTED**, and that the above-entitled action is **DISMISSED**.

**IT IS SO ORDERED.**

Dated this 13th day of April, 2016.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court